## Gardinier *against* Marcy.

In a collateral issue respecting the title to land, it is competent to give in evidence by the deputy-surveyor, the information which he received from one who was acquainted with the land, and which induced him to make the survey in what would otherwise seem to be an irregular shape.

The proper construction of the act of 1786 respecting the actual settlement of lands, which requires, "an actual personal resident settlement with a manifest intention of making it a place of abode and the means of supporting a family" is, that the "intention" shall be "of making it the means of supporting a family" by raising grain upon it. An intention of a settler, to make it the means of supporting a family, by cutting and selling the timber from the land, will give him no pre-emption right.

ERROR to *Susquehanna* county.

John Marcy claiming to be an owner of a tract of land, upon which Andrew Gardinier and others had cut a large quantity of timber, brought an action of replevin against them for the timber, and an action of trespass for cutting it; and the material question which arose between the parties, on the trial of these causes by the same jury, was to whom the title of the land belonged.

The plaintiff claimed title, which originated in an actual settlement by Ruben Collar fifty years ago; Collar sold to Jacob Shuch, who sold to the plaintiff and he had resided upon the land for forty years before the trial, but had no office title until the 9th of July 1832; he took out a warrant for two hundred acres; interest from the 1st of March 1786, upon which a survey was made the 30th of July 1832, of two hundred and four acres.

The defendant took out a warrant for the same land, upon which the timber was cut on the 16th of April 1832, upon which a survey was made on the 26th of April 1832, which was returned and a patent to Andrew Gardinier on the 18th of June 1832. The defendant also gave evidence of the declarations of John Marcy, made at different times, that he did not intend to take out an office right for the land, that his only object was to hold it until he could get the timber cut off, and then he would not pay even the taxes for it.

James W. Chapman, the deputy-surveyor, being under examination, the defendant proposed to ask him, whether, at the time he was executing Gardinier's warrant, and about to run the lines between Marcy's improvement and the Hartley survey, William Hartley, who was formerly interested in the Hartley survey, was present, and showed him the Hartley line, and where he represented it to be: and this for the purpose of showing that, at the time, he had reason to believe there was vacant land between the Hartley line and the Marcy improvement.

This evidence was objected to and rejected by the court, who sealed a bill of exceptions at the instance of the defendants.

v.—2 s

The plaintiff's counsel prayed the court to charge the jury,

" 1. That if the jury believe the plaintiff entered upon the lands with a view to make them a permanent residence for himself and family, and has continued to reside thereon, and has made large and valuable improvements, he has a pre-emption right, by such settlement, to four hundred acres, or such less quantity as he might be disposed to take a warrant for, to be laid out in a reasonable manner, so as to accommodate his improvements with adjoining timber land, water, &c., in a reasonable manner."

The court answered this in the affirmative.

" 2. That if the jury believe from the evidence, that Gardinier, previous to making his survey, knew that Marcy claimed the land under his settlement right, then he was bound, before he located his warrant, to call upon Marcy to ascertain the extent of his claim, and if he proceeded to make his survey without thus ascertaining the extent of Marcy's claim, he did it at his peril, and could not acquire any title thereby to lands within Marcy's claim."

Answer.   If this interrogatory had stopped at the word " peril," it would have been correctly stated; but as it is, it becomes a matter of fact for the jury on the whole evidence.

The defendant's counsel pray the court to charge the jury,

" 1. That even if there be no vacant land between Marcy's improvements and the Hartley line, it will affect the validity of the survey of the defendant."

Answer.   This is correctly stated.

" 2. That in order to give any right to Marcy as an improver, the jury must believe that he had at all times a continued intention to purchase the timber land from the commonwealth, by taking out a warrant for the same, and paying the purchase-money, with interest from the commencement of the improvement."

Answer.   This is correctly stated.

" 3. That if the jury believe the intention of John Marcy was merely to get the timber off the land, and then abandon it, he would not acquire any pre-emption right under the commonwealth, and the land would be open to the warrant of Gardinier or any other person."

Answer.   The court think otherwise if Marcy's claim was defined, and he had not more than four hundred acres included within it.

" 4. That though Marcy's claim included the timber land, yet, if the jury believe, that, as he said to Wilson, he merely intended to cut off the timber, and then not clear the land out of the office, but abandon it after so getting the timber, such conduct would be a fraud upon the commonwealth, and would leave it open to appropriation to the first applicant."

Answer.   The court think otherwise.

" 5. That if the jury believe, from declarations of Marcy to Jayne, that he would not pay the taxes for the mountain land after he got the timber off, from the same declaration to Wilson, and the further

[Gardinier v. Marcy.]

one, that in such case he did not intend to clear the land out of the office; for the payment of taxes on only thirty acres, for several years in Susquehanna county; from the abandonment of the land from which he had cut the timber, and from other evidence in the case, that Marcy did not intend to take the warrant for the land, provided he could get off the timber, 'then there was no implied contract between Marcy and the commonwealth existing at the time Gardinier took out his warrant."

Answer. The court think otherwise.

" 6. That if the jury believe from the evidence, and circumstances of the case, it was the intention of Marcy to abandon the timber land, after cutting the timber, without taking out any title for that land from the state; that in such case it would not be required of Gardinier, previous to locating his warrant, to call upon Marcy to ascertain the extent of his claim, as alleged in the plaintiff's second point submitted to the court, so far as said timber land is affected by said location of Gardinier."

Answer. This is correct; the defendant would proceed at his peril, and the jury will decide upon the whole evidence.

" 7. That the right acquired by an actual settler, is merely a preemption right, acquired under the law from and under the state, and that this pre-emption right necessarily implies, upon the part of the settler, an intention to pay the state for the land."

Answer. This is correctly stated.

The jury found a verdict for the plaintiff for 500 dollars.

Errors assigned.

1. That the court erred in rejecting the evidence as set forth in the bill of exceptions.

2. That the court erred in their answers to the third, fourth, fifth and sixth points submitted by the counsel of the defendants below.

*Connyngham*, for plaintiff in error, on the subject of the second error assigned, cited Gilday *v.* Watson, 2 *Serg. & .Rawle* 409; Pfoutz *v.* Steele, 2 *Watts* 409; M'Mutrie *v.* M'Cormick, 3 *Penns. Rep.* 432.

*Jessup* and *Willison*, for defendant in error, cited Barton *v.* Glasgow, 12 *Serg. & Rawle* 149.

The opinion of the court was delivered by

KENNEDY, J.—The first error assigned is in a bill of exception to evidence rejected by the court. The defendants below, who are the plaintiffs in error, offered to prove by Mr Chapman, the deputy-surveyor of the district, who made the survey locating the warrant of Gardinier, one of the plaintiffs in error, that at the time he was doing the same, and when he was about to run the lines between Marcy, the defendant in error's improvements, and the Hartley survey, William Hartley, who at the time, or previously thereto, had

been interested in or owner of the land held under the Hartley survey, was present upon the ground with the deputy-surveyor, and showed him the Hartley line, and where it ran.   The object of this evidence was to show that the survey of Gardinier was made under information calculated to produce an honest conviction, that the land taken into Gardinier's survey, adjoining to the Hartley survey, was vacant; because, being made under advice received from one who had had a connection with and an interest in the Hartley survey, it might therefore reasonably be presumed that what he said in regard to the land adjacent thereto being unappropriated or not, was true. We think that under this view the evidence might have been material to the issue, to show, if nothing more, that the irregular figure of Gardinier's survey was the result, as it was believed at the time by those concerned in making it, of the previous appropriation of the adjacent lands, and not the result of choice or design to deal unfairly with the commonwealth.   The evidence offered was certainly part of the *res gestæ,* and as it tended, at least in some degree, to show that the survey was fairly made, it ought to have been received.   We, therefore, think there was error in rejecting it.

The second error, though embracing four of the points, viz., the third, fourth, fifth and sixth, submitted by the counsel for the plaintiffs in error to the court below for their instruction to the jury on them, involve but one question; and that is, whether Marcy, the defendant in error, had a right to hold woodland within the compass of four hundred acres, including his settlement by virtue thereof, and to prevent the commonwealth from granting it to Gardinier, though he only wanted the woodland for the purpose of getting the timber trees growing upon it, converting them into lumber, and then abandoning it without paying the commonwealth for it.   The court below, according to their answers given to the third, fourth and fifth points, seem to have thought that he had such right; but, to the sixth point, they have answered as if they were of the opinion that he had not.

This inconsistency on the part of the court, in laying down the law to the jury, would of itself be sufficient to reverse their judgment.   Because it is certain that their answers being given to the same questions, and being in direct contradiction to each other, both cannot be right.   But how were the jury to determine which answer was right?   And again, supposing that the jury adopted the right answer, how are we to ascertain that they did so?   If we were at liberty to indulge in conjecture concerning it, it would perhaps be most reasonable to say, that they took that answer to be the law of the case which would seem best suited to support their verdict. But this is the answer which we think the court below ought not to have given.   Although it cannot be questioned, but a settler upon land, not otherwise appropriated, has a right to extend his claim by virtue thereof, so as to include four hundred acres, besides the usual allowance of six per cent. for roads, &c., yet he can only do it by

[Gardinier v. Marcy.]

conforming to the spirit as well as the letter of the several acts of assembly on this subject. It has been argued that the act of 1786 merely requires on the part of the settler "an actual personal resident settlement, with a manifest intention of making it a place of abode and the means of supporting a family, and continued from time to time, unless interrupted by the enemy, &c., without any thing being said of his intention to pay the commonwealth for it; and, therefore, whatever his design or intention may be in this respect, it cannot affect his right of pre-emption to the four hundred acres." It has also been said, that by cutting the timber trees off the land, for the purpose of converting them into lumber, and making profit thereby, without intending to make any further use of the land, is making it "the means of supporting a family" as well as if it were used for agricultural purposes. But these arguments are more specious than sound; because they do not comport with what must be considered the true meaning and spirit of our land laws. The meaning of the words, "making the land the means of supporting a family" may be considered as explained by the first section of the act of the 22d of September 1794, which declared, that "no application should be received at the land office for any lands within this commonwealth, except for such lands whereon a settlement had been or thereafter should be made, *grain raised,* and a *person or persons residing thereon.*" Thus connecting the personal residence upon the land with the business of *raising* or *growing grain upon it,* and by this means supporting the family residing thereon. Beside the quantity of land to be acquired, by a settlement being limited to four hundred acres, shows that this right of pre-emption on account of it was not granted to the settler for the purpose of inducing him to cut the timber trees off from the land without improving or cultivating it, and thus support his family; for, if the commonwealth had been content with this use alone being made of her wild and unappropriated lands, and willing to have granted such pre-emption right with a view to the accomplishment of this end, it is very obvious that four hundred acres would not have supplied the means of supporting a family in this way, but for a few years at most; and that a much larger quantity would have been requisite, and ought, therefore, to have been allowed. But using the land for agricultural purposes, and by these means supporting a family, which was clearly what the legislature intended, four hundred acres was a very ample allowance. Then, as regards the intention of the settler to pay the commonwealth for the land, I do not see how he can be said to intend making it the *permanent* and *continuous* means of supporting his family, unless he also intends complying with the only condition ultimately, upon which he can expect to hold it, to wit, that of paying to the state the purchase-money for it. From the express language of the act, as well as the plain meaning of it, the settler must not only intend to make the land his permanent place of abode, but likewise the *permanent means* of supporting his family; for the

[Gardinier v. Marcy.]

words, "*continued from time. to time*, unless interrupted, &c."
have a reference to both ; and whatever quantity of land, provided
it does not exceed four hundred acres, he really intends to appro-
priate and use for this purpose he is entitled to have.  But when he
says and makes it known in such a manner as to induce a belief or
conviction, that he has no intention of using or claiming the timber
land, or any portion of it, though within the compass of four hun-
dred acres of a reasonable figure around his settlement, for any other
purpose than that of cutting off the valuable timber growing upon it,
and then abandoning it, without paying the state for it, it is evident
that he intends to practise a fraud upon the state, by divesting the
land of all its valuable timber, and perhaps of every thing that it is
valuable for, rendering it, therefore, worthless and paying her nothing
for it.   It is not to be endured for a moment, that the settler, whose
intention is such in regard to woodland, though contiguous to his
settlement, and which he might, therefore, fairly enough entitle
himself to by virtue of his settlement if he would, shall be per-
mitted thus to deprive the state of her right of selling such woodland
to another.   The court ought, therefore, to have instructed the jury,
distinctly and without contradiction, to this effect.   I would observe,
however, that there is great allowance to be made for the court be-
low in this case, on account of so many different points having been
drawn up and submitted by the counsel to the court, though it was
only to have their direction to the jury upon one single question.
In the hurry of the trial, when a number of points are presented in
such manner to the court for their instruction on them to the jury,
with but little time allowed for reflection, it would be wonderful
indeed if the court did not frequently misapprehend the import of
some of them, and consequently fall into error in answering them.
If counsel wish to have a question of law growing out of their case
solved correctly by the court to the jury, so that it may be clearly
comprehended and understood by the latter, they had better make
but one point of it; for by multiplying points with studied varia-
tions, for the purpose of obtaining an answer in reality to the same
question, if the court do not become perplexed and confused by such
course it is most likely that in all cases the jury will, though the an-
swers should be correct.

Judgment reversed, and a *venire de novo* awarded.