## Marcy *against* Gardinier.

The execution of a warrant, under the direction of the warrantee, including within the survey lands which he knew to have been previously appropriated, does not render the survey void, except as to that part which was erroneously included.

A warrant may be executed by including within the survey two separate parcels of unappropriated land, lying on opposite sides of land previously appropriated and improved.

ERROR to the common pleas of *Susquehannah* county.

John Marcy against Andrew Gardinier. This was an action of trespass for cutting timber, which involved the question as to the title to a tract of land.

The points decided and the facts are distinctly stated in the opinion of the court.

*Jessup* and *Williston*, for plaintiff in error.
*Cunningham*, for defendant in error.

The opinion of the Court was delivered by

KENNEDY, J.—The first error is founded on an exception to the answers of the court below, given to three points submitted by the counsel for the plaintiff. The answers of the court to the two first of these points accord with the decision of this court made in regard to them, when this case was here before on a former writ of errror; see 5 *Watts* 337. It is therefore unnecessary to go into any further argument now to show that the court was right in answering them as it did. The third point however being new and not made before, it becomes proper to notice it particularly, and to give at least some of the reasons why a majority of this court think that the court below answered it also correctly.

The plaintiff's counsel, by this point, requested the court below to instruct the jury, "that if the survey made under the warrant of Gardinier included a part of the improvement of Marcy, and was made at the direction of Gardinier, he knowing at the time that it so included a part of the improvements of Marcy, and the two parts of said survey were connected by thus running across the land of Marcy, and the adjoining lands of Hartly, which were also improved, Gardinier, knowing, at the time of making the survey, that they were so, and that he was running across the land of Marcy and Hartly, directed the surveyor so to run it, the survey would be void, and would not vest any title in Gardinier to the lands contained in it."

[Marcy v. Gardinier,]

To which the court in reply answered, "it would be invalid as to the improved lands, and good as to the land that was vacant and unappropriated." According to the draft of the survey of Gardinier, the plat appears to be of considerable width at either end, but reduced in the middle to a narrow strip of only two or three perches in width, exhibiting, certainly, quite an unusual figure for a survey or tract of land. The question which it is alleged was intended to be raised by this point, and that has been argued here is, whether a survey be good or absolutely void, which includes two separate parcels of unappropriated land, lying each on opposite sides of land previously appropriated, where the owner of the warrant and survey caused the survey to be extended across the appropriated land knowingly, by taking in a narrow strip of the same, of two perches only or so in width, for the purpose merely of having the two unappropriated parcels included in appearance within one entire tract or survey. I am inclined to believe however, that the question argued by the counsel for the plaintiff is not necessarily embraced by the terms or language of the point, as drawn up and submitted to the court below. It would appear to contain nothing more than a request of the court to charge the jury, that if they should find that Gardinier, in making his survey on his warrant, knowingly extended it across the lands, then and previously to the granting of his warrant, owned by Marcy and Hartly, that the survey of Gardinier was therefore void *in toto.* The terms also in which the answer of the court is couched, would seem to indicate as if they understood it in this sense. If this then be the fair import of the language of the point, there is no ground whatever for saying that the answer of the court is erroneous. It is most unquestionably in accordance with an uninterrupted and uniform series of decisions made by this court on the very point itself; so that it cannot be considered now as being even open to debate, In short, although it has occurred in numberless cases almost, which have heretofore come under the notice of this court, that the owner of a warrant caused land to be included within his survey which he knew to be previously appropriated, yet I am not aware that it was ever gravely contended that the survey was void on that account, as to the unappropriated land contained within it. Indeed I think it probable that it was never before alleged, that because a warrantee, in getting a survey made on his warrant, knowingly directed and caused the deputy surveyor to include within it land which was previously appropriated with that which was vacant and unappropriated, that therefore the survey was void as to the vacant land.

But, admitting the question now raised and argued by the plaintiff's counsel to be embraced within the point as put to the court, is the answer given thereto by the court erroneous? It has been argued that the survey of Gardinier was made in the form that it appears to be, with a view to evade the direction, in regard to making surveys, contained in the fifteenth section of the act of 1785, and therefore ought to be considered void. By this section it is enacted,

VII.—V 2

[Marcy v. Gardinier.]

among other things, that "in making any survey by any deputy surveyor, he shall not go out of his proper district to perform the same, and every survey made by any deputy surveyor without his proper district *shall be void* and of *none effect:* and the surveyor-general and his deputies are hereby severally *directed* and *enjoined* to locate and survey, or cause to be located and surveyed, the *full amount* of land contained and mentioned in any warrant in *one entire tract,* in such manner and form, as that such tract shall not contain in front on any river more than one half of the length or depth of such tract, and to conform the lines of every survey in such manner as to form the figure or plot thereof, *as nearly as circumstances will admit,* to an oblong of three times the breadth thereof." It ought to be a sufficient answer to this argument, to show that the fifteenth section of this act has been adjudged not to extend to the lands within the purchase from the Indians in 1768, of which the land in question forms a part; nor to any purchase made prior to the last, which was in 1784. In the lessee of Steinmitz *v.* Young, 2 *Binn.* 523, the late Chief Justice Tilghman says, "it has been *expressly* decided by this court in the case of M'Ginnis's Lessee *v.* Albright, December 1799, that this act does not extend to any part of the state but that which lies within the last purchase from the Indians." And upon this ground the fifteenth section of the act, in a part not recited above, allowing only of an excess of ten per cent above the quantity mentioned in the warrant as being surveyed and returned, was held not to be applicable in Steinmitz *v.* Young; and accordingly a survey made in 1788, including two hundred and eighty-eight acres, lying within the old purchase, upon a warrant of one hundred acres only, was adjudged good. And indeed some years before, as early as May 1793, at a court of *nisi prius* holden at Washington before M'Kean, chief justice and Yeates, justice, in the Lessee of Wright *v.* Wells, 1 *Yeates* 286; S. C., 2 *Smith's L.* 201, it was ruled, after full argument, that this fifteenth section related solely to lands lately purchased at Fort M'Intosh. And accordingly a survey made by John Hoge, a deputy surveyor, of land lying within the purchase of 1768, the same as the land here, but altogether without his district and within that of Pressley Neville and Matthew Ritchey, other deputy surveyors, was held good. This decision was recognized afterwards by this court as late as 1815 in the Lessee of Harris *v.* Monks, 2 *Serg. & Rawle* 560.

Besides, it is very obvious that there was not the same reason for extending all the provisions of the fifteenth section to the lands of the state included within the previous purchases from the Indians, that there was for requiring them to be observed in regard to the lands within the purchase of the preceding year. The lands within the previous purchases had all been partly disposed of, under previous regulations of the proprietaries directing them to be sold in parcels to suit purchasers: in many places the best lands had been culled by purchasers so as to leave small parcels of very inferior quality,

and of much less quantity than a warrant might be obtained for, un-appropriated and entirely surrounded by appropriated land.   Several of these small parcels of land thus left unappropriated, though not of sufficient value singly to induce a purchaser to incur the *extra* expense of taking out a warrant for each, yet collectively he might be very willing to pay the purchase money and the expense of one warrant for the whole.   In such case it would therefore have been unwise and injurious to the interests of the state to have prohibited absolutely the surveying the full quantity mentioned in the warrant, otherwise than in one entire tract; and certainly not the same oc-casion for giving a direction of a cautionary nature merely, as I con-ceive this to be, to the surveyor-general and his deputies.   But ad-mitting this section to be applicable to the land in question, still I apprehend, if it is to be regarded as only directory, that it does not belong to a court and jury, under the circumstances of this case, to declare the survey of Gardinier void *in toto.*

In the construction of this section there is obviously a studied change and adaptation of phraseology as to the various provisions of it, which tend to show very clearly, the legislature did not intend that the same effect or consequence should result from a violation or non observance of each of them.   By the first clause of the section, it is enacted, " that in making any survey by any deputy surveyor he shall not go out of his proper district to perform the same, and that every survey made by any deputy surveyor without his proper district *shall be void and of none effect.*"   Now although the subsequent provisions of the section consist of instructions to the surveyor-general and his deputies, as to the manner in which they shall make surveys and perform the duties assigned to them, yet in no case, except the first, is it declared that the survey or act shall be *void* and of *none effect,* if not performed in the manner and form prescribed.   If the legislature had intended that as often as any instruction expressly given by this section, directing how a survey should be made, were disregarded either by the surveyor-general or any of his deputies, that the survey should therefore be *void* and of *none effect,* why did they not say so, as they have done where the deputy surveyor shall go out of his proper district and perform it?

Under this view Mr Justice Brackenridge, in M'Rhea *v.* Plummer, 1 *Binn.* 231, seems to have thought that the ninth section of this same act might be considered *directory* merely, so far as it requires a deputy surveyor in making a survey to go upon and measure the land and mark the lines, because the subsequent clause declaring that " every survey made *theretofore* should be *void* and of *no effect* what-soever," might be regarded as being applicable only to the pre-vious clause of the section, which, after directing the survey to be made as aforesaid, declares that it shall be made " *after* the warrant authorising such survey *shall come to the hands* of the deputy surveyor, to whom the same shall be directed."

It would seem to be an imputation against their intelligence to

[Marcy v. Gardinier.]

suppose that the legislature, after having declared expressly that a survey made in the first case should be void, omitted to do the same without any notice whatever, for not being made in conformity to the subsequent directions of the section. We should not only be wanting in respect to that body, but would be doing violence to their intention, if language is to be regarded as expressive of it, if we were to determine that they meant and intended the effect to be the same in the latter as in the first. And even if the reason for making a distinction were not clear, it would perhaps not be very becoming to reject it for that reason alone; but such is not the case here, for the reason is perfectly manifest, and such as cannot fail of presenting itself at first view to the mind of every one. It is perfectly evident, the great object of prohibiting a deputy surveyor from making a survey out of his proper district, was to prevent two or more surveys from being made in favour of different warrantees on the same land. By confining such deputy surveyor within his own district, where he had either made all the previous surveys, or had some knowledge of them, derived from documents appertaining to his office and in his possession, which had been executed within it, he, when a new warrant came into his hands to be executed, would be more likely to know what lands had been previously appropriated and surveyed than the deputy of any other district, and therefore would be more likely to avoid the error or mistake of locating it upon lands previously appropriated. This was considered a matter of the very first importance, not only to the individual warrantees but to the state, in order that all cause of litigation might be avoided as far as possible. And hence it was deemed advisable by the legislature to pronounce every survey made by a deputy surveyor without the limits of his proper district absolutely *null* and *void*. But in requiring the quantity of land mentioned in the warrant to be surveyed in one entire tract, it is obvious that this was done for the purpose of preventing the owner of it from making up the whole quantity, by culling out various parcels, lying in different places not contiguous to each other, on account of their very superior quality or properties and eligible situation, which if permitted would have been an injury to the state, by rendering the adjacent unappropriated lands less valuable. In order however to accomplish this latter object, without carrying the direction beyond the reason of it, and to an extent that might have proved injurious to the interests of the state in many instances, it would seem to have been proper, if not indispensably necessary that the surveyor-general, at least, should have been invested with a discretionary power to be exercised according to his best judgment, binding him to adhere to the letter of the direction only where the interest of the state seemed to require it, but to depart from it wherever he should be satisfied that an adherence to the letter would be detrimental to the state. That the exercise of such a discretion might have been thought proper by the legislature will appear highly probable, if not certain, when we come to reflect for a moment and

see how utterly impracticable it was, that it could otherwise happen than that, after having located and surveyed a great many warrants, there would remain and be many parcels of unappropriated land of less quantity than what warrants were usually taken out for, left lying between surveys, which approximated, but not so as to adjoin ; and that unless two or more of them, though not adjoining to each other, were allowed to be surveyed upon the same warrant, it might be that no one would be willing to pay the expense of a warrant and other charges for survey and patent, in addition to the purchase money, for each or any one of them.   In such case it cannot be doubted, but it would be for the interest of the state in filling up the warrant to dispense with the direction, which requires the full amount thereof to be located and surveyed in one entire tract.   The intention and design of the legislature must be looked to in such case, and when ascertained, ought to be received as the only directory.   The reason of the provision here, and the evil intended to be guarded against, being once clearly discovered, we can scarcely avoid seeing the design of the act, which was to make this part of it, as well as the residue of the same clause, which directs that a tract surveyed with a front on any river shall not contain in front more than one half the length or depth of the tract.   This latter provision, though embraced within the same clause, has ever been regarded in practice by surveyors, as also by the profession and by courts, as merely directory ; and no court and jury have ever undertaken to pronounce a survey void for want of conformity to it, after the return thereof has been made into the surveyor-general's office, and accepted and approved by him, unless so far as it might be shown to have interfered with a conflicting claim of equal or prior date.

Upon these principles it was held in the Lessee of Grant *v.* Eddy, 2 *Yeates* 150 ; S. C., 2 *Smith's L.* 193, that the third section of the act of the 1st of April 1784, which required every applicant for lands to produce to the secretary of the land office a particular description of the lands applied for, with a certificate from two justices of the peace of the *proper* county, specifying whether the lands were improved or not, &c., that interest might be charged accordingly on the purchase money, was merely *directory* ; and the warrants of the defendant were, therefore, held good, though the certificate that the lands were unimproved was not signed by two justices of the peace of the *proper* county, that is, of the county in which the lands were situate, as required by the act, but by two justices of the peace of a different county.   The court there say, " the words of the act are merely *directory,* and *do not avoid* a warrant for want of a certificate, or for an improper one ;" and then proceed to show that whenever the object which the legislature had in view for requiring such certificate was attained or answered in any other way, as, that the land was unimproved, and therefore the state could not have been defrauded of interest on the purchase money for want of it, the warrant ought to be considered good.

[Marcy v. Gardinier.]

It appearing, then, in the case before us, that all the unappropriated and vacant lands lying on both sides of and around Marcy's claim, were not sufficient in quantity to fill Gardinier's warrant, or to give to him the quantity that he paid the state for, and that it was therefore impossible for him to commit or practise a fraud upon the state in locating his warrant as he did, his survey ought to be considered good as to the vacant land included in it, whether the fifteenth section of the act of the 8th of April 1785 be applicable to the land therein or not. But it is clear from the authorities cited above, that this section of that act does not extend to the land in question; and this being the case, it remains to inquire what there is beside which can be objected that will affect the survey so as to invalidate it.

The court, in the Lessee of *Wright v.* Wells, in speaking of the fifteenth section of the act of the 8th of April 1785, say, " the general object of the legislature was to introduce a *new system,* and to secure fair and equal proceedings as to the lands *newly purchased* from the Indians, but did not respect the *lands included in the old purchase,* and *such has been the practice under the law.*" In the opinion of the court, then, some of whom were probably more conversant with the regulations of the land office as to the granting and surveying of lands prior to the passage of this act than any of us, it is evident that the provisions generally of the fifteenth section were considered *new* and such as had not obtained previously. Indeed it is certain that no act of assembly was ever passed previously, requiring that the full amount of land mentioned in any warrant should be surveyed in one entire tract. Nor does it appear, from any of the regulations of the land office, nor from the instructions given to the surveyor-general or his deputies at any time anterior thereto, that such direction ever was given in the same terms. Among the *instructions* of 1765, given by the proprietaries, through their surveyor-general, to the deputies of the latter, 2 *Smith's L.* 163, the following may be thought perhaps to have some bearing on this subject : " 2. You shall not execute any warrant upon any *surveyed lands* or manors, or reputed manor lands, or on any other land appropriated to our use by any former survey, unless such lands be expressly mentioned in your warrant.

" 3. You shall lay out all lands as *regular* and *nearly contiguous* as *the places will bear, admit* or *allow of,* unless directed by your warrant to the contrary.

" 4. You shall lay out all lands that adjoin rivers or large creeks, at least three times the length from the river or creek as they are laid out in breadth on the said river or creek, so that each purchaser may have a proportionable front on the water, provided the ground will in anywise admit of it, and to *lay out all lands contiguous* and as *regular as possible.*"

Now, unless there be contained in some part of these instructions a direction to survey the amount of a warrant in one entire tract, I am not aware of any evidence that we have, going to show that any such rule ever existed, or that any such direction was ever given be-

[Marcy v. Gardinier.]

fore the act of 1785. I, however, am willing to admit that such direction may, by a construction that is perhaps not unfair, be extracted from these instructions. But then it is perfectly obvious that they are at most only *directory* in their terms, and that a discretion is thereby allowed to the deputies to be exercised by them; and whenever they shall be of opinion that the ground to be surveyed will not admit of a strict adherence to the direction, they are left at liberty to depart from it. The land surveyed under the same warrant is not required to be *contiguous*, unless the place will *admit* or *allow* of it: and at most, it is only to be as *nearly contiguous as possible*, so that if it were even otherwise, there is no ground for declaring the survey void on that account, after it has been, as in this case, returned into the surveyor-general's office, accepted and approved by him, and a patent granted thereon, confirming and consummating the title to the land contained within it. As well might the court and jury here have undertaken to set aside the survey and patent, because the survey was not as *regular*, in the language of the instructions, as the ground, in their opinion, derived from the evidence, would have admitted of. But whatever may have been the extent and design of these instructions, they have ever been held to be merely *directory*.

Neither is it any objection to the validity of Gardinier's survey, that he caused it to be made without the knowledge of Marcy, further than it may have been shown to have interfered with the prior rights of the latter. So far it would doubtless be void for want of Marcy's assent, which is the only thing that could have rendered it valid in this respect, even had he known of it and been present at its execution.

It has been said, however, that if Gardinier, in making the survey, knowingly crossed over the lands of Marcy and Hartly for the purpose merely of taking in the unappropriated or vacant lands on the opposite sides thereof, that by doing so, he indirectly at least, if not directly, violated a long established rule of the land office, that has never been dispensed with, which prohibits surveying the amount of the land mentioned in the warrant by locating it upon two or more separate parcels not touching each other; and therefore the survey must be considered *void in toto*, notwithstanding its subsequent acceptance and approval by the surveyor-general and confirmation by the secretary of the land office in granting a patent thereon. Admitting that such has been the rule of the land office in regard to making of surveys upon warrants, still it would be worse than absurd to carry the observance beyond the reason of it, because it would work a positive injury to the state in some instances, as has been already shown, by preventing it from selling and receiving the purchase money upon small detached parcels of land of inferior quality. Besides, so far as we have any written evidence of the existence of such rule, it would seem from its terms to have allowed to the deputy surveyors a dispensing power with the strict observance of it, where

land sufficient to fill the warrant could not be had in one contiguous body. And to say, because no instance of the exercise of such dispensing power has come within our knowledge, that we are, therefore, not only bound to conclude none has taken place, but likewise to determine that under no circumstances can such power be exercised without *avoiding* the whole survey, would be strange reasoning indeed, if reasoning it can be called : for suppose it to be true that no case of the kind has ever occurred, it only goes at most to prove, in the absence of evidence showing that it has been refused, that no owner of a warrant has ever requested to have it filled with disjointed parcels of land, where it was necessary for the surveyor to do so in order to get the complement: but even if it had been shown to have been refused in such case, it would only prove that the very spirit and reason of the rule had been transgressed and disregarded.

But it has been argued here as if the rule were universal, admitting of no exception under any circumstances whatever, and therefore the attempt on the part of Gardinier to evade it involves such fraud as vitiates the whole survey. Then, supposing the rule to be universal and of the utmost inflexibility, which may be thought very anomalous in respect to a rule that is merely *directory*, how are the rights of the commonwealth or of others so affected by such evasion of it, as to make it necessary, or even proper, to annul the whole survey ? As against the commonwealth there does not appear to be the least colour for asserting here that she has been prejudiced in the slightest degree. Gardinier, having paid the state for the quantity of land mentioned in his warrant, had an indisputable right to have the amount thereof surveyed to him out of the unappropriated land there, if there were so much ; but in making his survey he did not obtain this, so that, by running over Marcy and Hartly's lands as it is alleged he did, and taking in a narrow strip across them, he rather conferred a benefit upon, than did an injury to the state : because by filling his warrant in part with land which they either had paid or were bound to pay the state for, and would withhold from him, he put it out of his power to secure unappropriated land in lieu thereof for the money he paid, if it were there, which he had a right to have done ; thus leaving the state at full liberty to sell it again and to receive the purchase money on it a second time. It will scarcely be pretended that it ever was the policy of the state to multiply warrants and surveys as much as possible, for the mere purpose of making fees, and oppressing those who had to pay them, for the benefit of the state or the officers concerned in issuing and executing them ; yet unless this were so, it is impossible that the state could be said to lose any thing by permitting two or more separate parcels of land to be surveyed upon the same warrant in order to make up the quantity mentioned in it. But we know that the proprietaries and the state, instead of encouraging a policy of this kind, which would have been unjust and no less reprehensible, indulged in the very opposite of it, by permitting two or three hundred

[Marcy v. Gardinier.]

acres to be surveyed and returned on a warrant of fifty or a hundred acres, and a patent to be granted for the same upon the purchase money being paid therefor.

The only real injury done by the alleged evasion would seem to have been done to Gardinier himself, for by taking in land belonging to either Marcy or Hartly, or both, seeing he could not hold it, he thereby deprived himself of obtaining compensation for the money he paid the state on the warrant by locating it on vacant land in case it were to be had.   But it may be said that it was a trespass committed upon, the rights of Marcy and Hartly : and this may be true ; but they are not without redress if injured, for they may bring their action, in which they will be entitled to recover damages equal in amount at least to the extent of the injury received.   Beside this, they have a right to claim to be protected as fully in the enjoyment of their rights as if Gardinier's survey had never been made ; for this purpose the avoidance of it, as far as it interferes with their rights, will be sufficient.   But I am unable to discover any principle, which has hitherto been held applicable in a like case, which would tend to render the survey void beyond this, so as to affect the right of Gardinier to the unappropriated land included within it.   If the quantity mentioned in his warrant had been sufficient to have covered the unappropriated land or a part of it, and all the lands of Marcy and Hartly, and he had taken the whole within his survey, without exceeding the amount of his warrant, the survey, according to an unbroken chain of authorities, could only have been pronounced void as to the previously appropriated land embraced within it ; so that if the principle contended for by the counsel of the plaintiff in error were to prevail, a survey extending across an appropriated tract of land, and taking in only a narrow strip and small portion of it, will be void *in toto*, while another survey, taking in the whole of it, will only be considered void as to the previously appropriated land embraced within it.   Would it not then be singularly strange and incongruous to pronounce the whole survey void for having embraced within it a narrow strip of the lands of Marcy and Hartly, when, if the whole of their lands had been included, it could not have been so adjudged ?   It has often occurred that appropriated land has been surveyed upon a junior warrant or right, together with land that was unappropriated, and sometimes knowingly too by the owner of the junior right ; but it never was decided that the survey was wholly void on that account, nor partially further than as to the previously appropriated land.   And occasionally surveys under junior rights have been made extending across and embracing lands on both of the opposite sides of prior surveys under older rights, where the owners of the older rights have afterwards asserted their claims under them, and left the junior claimants with two and sometimes more detached parcels, which, it never entered into the mind of any one to conceive, that they could not hold under their warrants and surveys, and more especially if they had obtained patents for them.

VII.—W

[Marcy v. Gardinier.]

In principle then wherein do these cases differ from the present? The junior claimants in those cases may be said to have done all they did knowingly, as much as Gardinier did here; they were bound to know the elder rights, and must be presumed to have had full knowledge of them; and no case can be found, where the survey of a junior claimant has been held to be affected differently on account of his actual knowledge of the prior right, from what it has been under the knowledge which the law imputes to him. And as to the difference between the cases on account of the magnitude of the fraud intended to be committed, it cannot with the least shadow of plausibility be contended that Gardinier's fraud was any thing, if he only, as is alleged, took a narrow strip of Marcy and Hartly's land, not with a view of holding it from them, but merely for sake of giving a connected form to his survey, compared with the design of taking from another the whole or greater part of his prior survey, as was intended in many of the cases alluded to, where the junior surveys were held void only as to lands contained in them which were surveyed under prior rights.

Grants of land by the state, it may be observed, have seldom been set aside on account of unfair dealing or practice upon the part of the grantees. For instance, warrants founded upon settlement-rights have been obtained frequently by settlers or those claiming under them upon a wilful misrepresentation of the commencement of the settlements, by postdating them, in order to avoid the payment of interest on the purchase money to the state, and oftentimes to get the land at a reduced price, say 50 shillings instead of 5 pounds sterling per hundred acres, with interest on the latter price *for many years*; and although such cases have repeatedly come under the notice and cognizance of courts and juries, yet they have been uniformly held good notwithstanding, as against all adverse claims derived from the state subsequently to the dates of the settlements as set forth in the warrants: and the only penalty that ever has been inflicted in such cases has been a loss of their right under the settlement, when the land is claimed by an adverse title of earlier date than the date of the settlement as stated in the warrant, though in point of fact the settlement may have been of earlier date than the adverse title; but this the settler will not be permitted to prove, which necessarily leaves his title to all appearance the younger of the two, and of course he must give place to the elder. So persons claiming lands under old warrants and surveys made *upon* them, but not returned into the surveyor-general's office, have frequently taken out new warrants, sometimes to avoid paying interest, and very often not only to avoid paying the interest, but to obtain the lands at a reduced price from that fixed by law at the date of the old warrant; and yet such titles have been held good against the state, and void only against persons claiming under titles from the state prior in point of time to the new warrants.

But what seems to render all the objections of the plaintiff on this

[Marcy v. Gardinier.]

point unavailing, if not frivolous, is that, according to the testimony of Matthew Jackson the surveyor, his own witness, it appears that his warrant and that of Gardinier were more than sufficient to cover and take in all the land not previously appropriated under prior grants of the commonwealth to other persons; so that she had been paid once for all the land, and more than was there. Jackson testifies that there are but two hundred and eighty-three acres there, which he thinks does not include sixteen or eighteen acres consisting of some small gores of land next to Hoops's lines; and after adding these, the whole quantity would only be two hundred and ninety-nine, or three hundred and one acres at most, to fill Marcy's warrant of two hundred acres and Gardinier's warrant of ninety-four acres. The interests of the commonwealth are, therefore, in no wise involved in this controversy; the real matter of contest is, how shall this two hundred and eighty-three acres be divided between the plaintiff and Gardinier; so that let this question be settled as it may, it cannot affect or prejudice the interest of the commonwealth in any way. From the evidence it would not appear that there is the least ground for charging Gardinier with having done or intended any thing unfair against the state; and if in locating his warrant he has crossed what may be the wishes of Marcy now, the latter may very justly blame himself for it, because, from the evidence, his conduct as regarded the rights and the interest of the state may be considered any thing but fair. Even according to the testimony of his own witness, Mark Hartly, he, under colour of his settlement, surveyed and took in one thousand acres, professing to claim it, and cutting the timber off it, sawing and disposing of the same as fast as he could; and as would also appear from some of the evidence, without any intention of paying the state for more than a small portion of the land, but at the same time bent on taking from the land the timber, which would seem to have been the only thing of value appertaining to much the greater portion of it. Indeed it is pretty evident that if he had succeeded in his wishes and plans of operation, the state would never have sold the land, or, at most, but very little of it to any one; for without the timber growing on it nobody would have bought it. It would therefore seem to be as inconsistent with sound policy as with a sense of justice, to deprive Gardinier of land which he has *more* than paid the state for, and which the jury must have thought, from the evidence and the charge of the court, Marcy never intended to pay the state for, but to abandon as soon as he got the timber growing upon it cut off and taken away.

HUSTON, J. dissenting.—These cases were, by consent, tried together in the court below, and verdicts for defendants; and were argued together here.

These cases were before this court on a former occasion; but, as often happens, the arguments were more full, and the points on

which the cause turned different from what they were on the former hearing.

It will be necessary to state the case minutely.

E. Stevens proved that, forty-nine years ago last May, Reuben Collar lived on the land, raised grain, and had a cabin where Marcy now lives, and after some years sold to Streak, who enlarged the clearing, built a grist and saw mill, and thirty-nine years ago sold to John Marcy, who moved on and has resided ever since. The improvements extend from Wilson's line (on south and southwest) to the east branch of Tunkhannock creek, the whole length of Marcy's claim on the creek; that he claimed to Millard's line on the north; don't know his lines on east of creek; he always said he expected to hold four hundred acres; we all settled on the land as vacant.

Five or six other witnesses proved that Marcy's claim was, for twenty or more years, bounded on the west by Wilson, who sold to Jayne in 1817, and by Jayne since; on the north partly by Millard, west of Tunkhannock, and by Mark Hartly, whose line was at the east branch, and whose warrant and survey were about 1811. That on the east Marcy claimed until about eighteen years ago. Meredith and Clymer showed a survey in 1775 on warrants, and since then his line on east is bounded by them; that he once *claimed* part of their land and cut timber, as Hartly also did on Meredith's land, but not since their title was known.

Charles J. Miller proved that in 1829 he came to that neighbourhood, and wishing some land, Marcy agreed he might have some land adjoining Millard on the north, and west of Hartly, but not this timber land; that in running his land he took in part of the timber; that Marcy cut off the timber taken in by him and let him have the land; hence he inferred that the timber was Marcy's object. That he, Miller, had built a shed, house and blacksmithshop, and cleared a little, and had sold his seventy acres for 500 dollars, though he had not taken out any warrant.

The witnesses proved that the timber was cut adjoining the Wilson or Jayne line on the west, the land given to Miller on the north, and Marcy's cleared land on the east; that the timber had been very valuable, but the land on the side of the hill nearest the creek was poor, and some of it stony. Some witnesses also proved that Marcy had always saved this timber. The cutting and value of the land, with and without the timber, were proved; 20 or 25 dollars per acre, and 8 or 10 dollars after timber gone.

It was also proved that the whole vacancy, including what Miller got, was less than three hundred acres.

The defendant then produced Marcy's application, proving before two justices his settlement commenced in 1786, his warrant paying interest from that date, and his survey of two hundred and four acres, which included the land where timber was cut. Nothing was said here to show why this was not shown by Marcy himself.

[Marcy v. Gardinier.]

Marcy's land was thus bounded, and so understood by all' these witnesses for many years, by Meredith's line on the east, by Mark Hartly and the line agreed on by him and Miller on the north, and by Wilson, now Jayne, on the west. The timber was cut on the northwest corner. Nothing was said particularly of his southern boundary.

The defendants then showed a warrant to Andrew Gardinier for ninety-four acres of vacant land, dated the 16th of April 1832, a survey on the 26th of April 1832 of eighty-six acres ninety-four perches, and a patent on the 18th of June of the same year, and called witnesses to prove that Marcy had abandoned all land not within his fences and fields.

I shall, at the risk of being tedious, give the very words of the witnesses on this point.

William Wilson said : I reside on the Jayne possession, as it is called ; have lived there' fourteen years ; as I *always understood* Marcy to say, the timber was his principal object, and he did not mean to buy it of the commonwealth. *He spoke of the mountain land where he had been getting timber since I came there.* I think he spoke of it more than once ; think twice or more. He told me the back land was of no use, not worth paying taxes on. My land lay west and his east, and east and south is stony after the timber is off ; the more a man has and pays taxes on the worse he is off. Marcy got lumber south of the creek ; he had a contract with Halstead, who cut one hundred and fifty logs there. I took it he spoke of lands north of the road, as Meredith took that on the other side. Says Marcy's land (suppose including the bottom) is worth 50 dollars an acre with the lumber on ; worth 25 dollars now.

Being cross-examined, says: these conversations were since 1823 ; it may be a year or two; cannot fix the time nearer ; recollect, a year or two after I came, Marcy told me I could not hold more than I had in possession, for one man has as good a right as another if he does not pay taxes. That ended the conversation. *Marcy wanted to buy my improvements.*

William Smith. In 1831 I worked for Marcy seven or eight months; was harvesting corn on the island fronting this timber. I asked Marcy how far his timber extended that way. He replied, he did not know. I replied, he had a good deal of timber on that hill. He said he had. I asked him how far back of where he had been cutting timber his line was ; said he did not know as he went there at all ; did not know as he had any land there ; did not wish me to say any thing about it ; for if Coil found it out, he would go and get the timber, and he could not keep him off ; and he, Marcy, must get it off soon. Said nothing about the title.

Joshua Millard. Had a conversation with Marcy since the cause went into the supreme court. He spoke of the trouble Gardinier made him ; that it was a pity he did not take it out of the office before. He said he did not think he would have taken it out, but that

Gardinier had got him in such a situation that he was obliged to take it out; that there was no law to oblige him to take it out. Did not hear him say any thing about taxes.

William Hartly. Proved that when Marcy first heard of the title of Meredith and Clymer, he had a number of trees out on it, and witness told him he thought it would be well to take it out of the office or he would lose these logs on it. He answered he did not think the land was worth taking out of the office, for he thought he would soon cut the timber off. This was sixteen or eighteen years ago.

Charles Miller, called by defendant, repeated what I have already written, with little variation: that Marcy told him he might take a piece adjoining Millard, but so as not to take this timber land; and that soon after he went there, Marcy cut off the timber which Miller had included within his line. The land in question lay between that and Marcy's mill. I drew the inference, his object was the timber.

Matthew Jackson proved, that in the winter before Gardinier's warrant was taken, he had some intimation of the intention, and told Marcy, who said, no one would be rascal enough to do so. That Marcy spoke to him to run round his land to see how much was in it, that he might take a warrant for it. Others proved that he had proposed to take out his warrant in the spring, when he went down on a raft, as he was old and lame.

Chapman, the deputy surveyor, who surveyed Gardinier's warrant, said: I made the survey for Gardinier. The manner showed me he did not care about making much noise. Gardinier spoke in general terms about the hostility against surveyors, and particularly about Marcy's not being willing to have surveys. M'Cracken and Clark were chainmen and Gardinier carried the axe; this was in the afternoon. Next morning W. Hartly and Smead were there when we run on the east side of the creek. There was some apparent desire not to be seen by the neighbours. Just before we got through the flat, Smead was left in the woods, his gun went off. Gardinier and some of the hands ran into the bushes. Smead immediately said his gun went off by accident. I said I wanted no secrecy. Gardinier said he wanted no difficulty with Marcy. I made the survey as he directed. Gardinier said he wanted to avoid all collision with Marcy, and had a right to survey the land.

William Hartly proved, that Smead and himself were employed expressly to look out and give notice if any of Marcy's people came in sight.

The survey was made in this manner: it took in all the woodland west of the creek bounded by Miller, Jayne and Marcy's improved land; it came to Tunkhannock creek, and then ran up and included the creek and some of the land on the banks, and included an island cleared and cultivated by Marcy; at this part it was bounded by Marcy's improved land on both sides. At the upper end, and east

[Marcy v. Gardinier.]

of the creek, Marcy's fence was on his line for about sixty rods; a line was run along this fence and another eight rods north of it, thus taking that breadth off Mark Hartly's land; it then ran round close to Murray's fences and took in all the woodland on the east side of the creek.

When this case was up last year, the question was not presented, whether there was any legal evidence on which Marcy's right to the land could be doubted. This was assumed in the argument by the court. The argument and opinion, of the court were on other matters. To me it seems this is the great question, and a very important one.

There was a time when rights to land by improvement were considered of little weight. M'Curdy v. Potts, in 2 *Dall.*, seems to confine them to what was within the fences; but ever since Smith v. Brown, in 3 *Yeates*, the right has been extended to agreed lines or designated boundaries; and it has been considered as settled by the profession, for more than forty years, that an improver on vacant land had a right to four hundred acres, though he may take less; and our books, at regular intervals, show that some one disputed this occasionally, and it was always affirmed. In Gordon v. Moore, 5 *Binn.* 130, this was explicitly settled, where the improver had designated his boundary by a known line, before the adverse warrant was taken out; and in Barton v. Glassgo, 12 *Serg. & Rawle* 149, where there was an improver actually residing on land when an adverse warrant was laid, and which improver had not designated his boundaries, it was held that the improver was not limited by lines run without his knowledge, but he was still entitled to four hundred acres, in such shape as the jury should decide to be reasonable, and *this was* before decided in Blair v. M'Kee, 6 *Serg. & Rawle* 113.

An improver's right, at one period, was sold as a chattel, by the executors or administrators; since 1760 this has not been allowed; it can only be sold by administrators under an order of the orphan's court; Duncan v. Walker, 1 *Yeates*; will only pass in fee by will executed so as to pass lands, and having words of inheritance. 2 *Yeates* 379. Settlement rights descend in same manner as lands held by patent, and widows will have dower of them; 3 *Yeates* 571, 572; may be mortgaged, conveyed in trust or entailed. In short, a tract occupied forty years constantly, houses, barns, mills and one hundred acres of cleared land, as John Marcy's land was, except as against the state to whom the purchase money was due, is as good a title as any man could have to land in this commonwealth; and when his boundaries were for twenty years designated as here, his title to the woodland within those boundaries was as good as to that within his fences. The act of the 30th of December 1786 provides that no warrants shall issue from the land office of this state for any tract of land on which a settlement is made, unless to such persons who have made the settlement or their legal representatives, until the 10th of April 1788, and if any shall issue otherwise than aforesaid, it shall be deemed to have issued by surprise, and shall be of no avail in law. The time has been and is yet extended.

[Marcy v. Gardinier.]

In Merchant *v.* Millison, 3 *Yeates* 76, and more particularly, in Davis *v.* Kuyler, 4 *Binn. Rep.* 160, it will be seen how far a settler who continues his improvement, and has his boundaries between him and his neighbours ascertained, will be protected against subsequent warrantees and dishonest surveyors. In the last case, and in Porter *v.* Henry, 4 *Serg. & Rawle* 441, the improver taking a warrant and having a survey made was held not to be conclusive evidence of abandonment of the part not included in the survey, but must be left to the jury; and in both cases the jury held it no abandonment under the evidence in those cases, and the finding in each case was approved by this court. The first question to be noticed in this case is, was there any evidence that ever John Marcy, at any moment, said any thing which could be tortured into an abandonment of the lands on which the timber was cut? Wilson is the principal, if not the only witness: he says Marcy spoke of the mountain land where he has been getting timber ever since I was there. Now, all the testimony is, that Marcy never got any timber in this grove, which he was reserving as near his mill and house. He showed Miller in 1829 where he might settle on land north of this; but not on this; and in 1831, when on the island opposite where the grove stood, he said he had a good deal of timber on that hill. The rest of the conversation is perhaps unintelligible to us; how far his land extended beyond where he had been getting timber? Now we don't know where he had been getting timber, or the timber alluded to; we only know that after Miller came, he had cut on what he allowed Miller to take, and that lay beyond the land in question. The conversation proved by William Hartly only shows he did not think it right to take a warrant at that time; besides that related to land since given up to Meredith, a mile from where this purchase was executed and east of the bush. Can any jury believe that even Gardinier, who did not want Marcy to know, and who had two scouts out with guns to give notice if any of Marcy's family came in sight, thought this land was abandoned? I pass over the fact that Marcy at that moment was wishing to purchase from Wilson land adjoining this very lot of timber. If a jury could in any country be found who, would say he ever thought of abandoning every tree outside of his fences, another most material question in law arises. These conversations were not with Gardinier, nor in his hearing, and were at least thirteen years before he took out his warrant.

I have endeavoured to show that the right of Marcy, who continued occupying this land, was as to all, except the state, as good as if he had a warrant or patent; transmissible only by deed or parol on delivery of possession and receipt of the price, or, as has been held, by gift, and the donor taking possession and making valuable improvements, as in Taylor *v.* Eckert, and Benson *v.* M'Henry. In each of those cases, however, the communication was direct between the parties, "go on the specific land and you shall have it." In each case there was immediate possession, improvements continued

[Marcy v. Gardinier.]

twenty years, and only claimed after death of donor by his heirs. So in the case of the permission to Miller by Marcy, and immediate possession, and house and smithshop built, and land cleared by Miller. We have not among our reported cases much on this subject. The cases have occurred in the common pleas. In New York it has occurred, and been the subject of repeated decision. In 6 *Johns.* 21, parol evidence was admitted to support a tenancy or to satisfy doubts as to possession, but not as evidence of title or disclosure of title ; it would counteract the beneficial provisions of the statute of frauds. 7 *Johns.* 188, not admissible where the disclaimer is not made to or in the presence of defendant. 10 *Johns.* 336, if an interest passed, no subsequent disclaimer by parol can divest it, for a freehold interest cannot be divested by words *in pais* 16 *Johns.* 302, 303, it is said to have been frequently settled that a parol disclaimer cannot divest a right.

If two or three men by each swearing that a landholder told him he had no title, and this when no other person is present, it cannot be disproved, and it will be a cheaper way of depriving a man of his lands than by digging up his line trees. There are many hundred valuable tracts held by improvement : if proof that the owner, who has continued to reside on, and cultivate, and pay taxes, can be deprived of all his woodland, by proof that he or his father said something fifteen or twenty years ago, it is time it was known. The timber land is the most valuable part of many of these tracts.

The evidence in this case presents a curious history of men who violate every law of God and of man, every social and moral duty; but yet will do it in a way which seems to violate none. John Marcy runs round eight hundred or a thousand acres that he may seem to be taking timber from his own land ; when speaking of this land he says, the land from which I have been taking timber is not worth paying for. As the several owners appear and show title and lines, he cuts no more on their land, and no doubt sets his conscience at ease for all he had stolen from them, by this appearance of respecting their titles. But he does not escape so, even in this life. He has assisted to introduce a laxity of principle, and complains that younger men now want his timber. They will not openly steal it, but remember some long forgotten expressions, or invent some, and under colour of these take out a warrant for land and survey it so as not to leave him a tree for his sawmill, or for rails, or for firewood, under pretence that he had abandoned it ; they know he has not; they know that he will resist their survey, and they go armed to protect themselves while surveying what they pretend he had disclaimed ; for farther colour they pay the state at the rate of 10 pounds per hundred acres for land which on Marcy's improvement would cost above 40 pounds. To seem within the law they pay 25 dollars, and take Marcy's property, worth from 500 dollars to 2500 dollars. Certainly Marcy's conduct has been highly culpable, but no law punishes it by forfeiture of lands and tenements. I am therefore

[Marcy v. Gardinier.]

of opinion that even if the jury can believe John Marcy used all the words proved by the witnesses, and if they can believe he was speaking of the lands immediately round his clear land, yet as these words were spoken many years ago, not to the defendants nor in their hearing, they did not give Gardinier any right nor colour of right to make his survey or cut this timber; and more especially as no neighbour ever heard of this abandonment, and in 1829 to Miller he expressly claimed this land, and as land even then thought of little value has since been sold by Miller for 7 dollars per acre.

As against the improver still residing on and clearing the land, Gardinier's warrant and patent, in the words of the act quoted above, are of *no avail in law;* if Marcy's claim was abandoned, they might give title against a subsequent claimant.

But another point was discussed in the common pleas and here, which, although in my opinion not material to the decision of this case, yet deserves some notice. I have stated that, by the direction of the owner, and with the knowledge of the surveyor, the Tunkhannock creek, running between Marcy's cleared fields, was surveyed for Gardinier. When this brought the party to the upper end of Marcy's land, they went into Mark Hartly's land, and east through it until they were past Marcy's clear land and then ran by his fence so as to take all his woodland east of the creek, as they had before all west of it. On this eastern part Gardinier built a cottage house the next day after his survey, and put M'Cracken and his family in it the same night, and who lived there more than a year; Gardinier claiming it; this cabin and occupation were before Gardinier & Co. cut the timber in question. Since the first trial, this house has been pulled down; and at the argument here, Gardinier's counsel said he admitted the survey including the creek and also the land east of the creek could not be held, but claimed right to that west of the creek where the timber was cut. The judge below held the survey of the creek and of Hartly's land void; but that Gardinier could hold the two separate parcels east and west of Marcy's cleared land. I have endeavoured to show that the whole was unseated on the grounds stated. I am also of opinion that no warrant can be laid so as to include two separate parcels of land. I do not speak of the case where the last warrant is by mistake laid across an old survey, which when claimed may separate the two ends of the last survey; in this case it was done with full knowledge, and the owner and deputy surveyor both knew it; but they wished to seem to make it one survey. Attempts to defraud the state and others have not been countenanced in this court. Applicants for lands were directed to put each an application in for the tract he wished to purchase, and on the 3d of April 1769 priority of right was settled by priority of number drawn in a lottery; but when any person put in two applications for the same tract, to double his chance, he lost both and could get neither. De Haas *v.* Galbraith, 2 *Yeates* 305, and other cases.

[Marcy v. Gardinier.]

I may assume, then, that if two separate parcels cannot be openly and directly surveyed and returned on one warrant, the same thing cannot be done covertly and fraudently, so that the surveyor-general may accept the return without knowing its true character.   On the 8th of April 1785 was passed an act whereby to provide further regulations so as to secure *fair* and *equal proceeding* in the land office, and in *the surveying of lands.*   The first eight sections relate in terms to warrants to be thereafter issued for lands purchased from the Indians in 1784; the next nine sections (except the twelfth, as to laying off districts in last purchase) in their terms relate to all lands in the state; the eleventh is the section under which every deputy since appointed has given bond for faithful performance of his duty; and in it is given the authority to the surveyor-general to appoint deputy surveyors.

The fifteenth section is in these words: " in making *any survey* by *any surveyor* he shall not go out of his proper district to perform the same, and every survey made by any surveyor without his proper district, shall be void and of none effect; and the surveyor-general and his deputies are hereby severally directed and enjoined to locate and survey, or cause to be located and surveyed, the full amount of land contained and *mentioned in any warrant in one entire tract,* in such manner and form that each tract shall not contain in front on any river, &c. &c.

The act of 3d April 1792, entitled an act for the sale of the vacant lands of this commonwealth, in its first section fixes the price of all the vacant lands in every part of the state; the sixth is a repetition of the fifteenth section above quoted, except that the word *lake* is inserted after river.

The instructions from the surveyor-general to his deputies, from about 1710 down to this time, direct, in substance as above, that each warrant is to be surveyed in one tract.   No lawyer at the bar and no judge on the bench ever saw or heard of two separate and distinct parcels of land being surveyed and returned on one warrant; the land officers never sanctioned, or where they knew of it, never received such a survey.   This is the first time since the settlement of the province where a court has been asked to sanction such a survey.   I am aware that in Steinmitz *v.* Young, 2 *Binn.* 520, it is said to have been decided in Albright *v.* Maginnis that the fifteenth section above quoted did not extend to any land out of the purchase of 1784.   That case has been so reported, and no such point arose or could arise or was decided.   See 2 *Yeates* 485.   But the first clause of the section, as to surveys made out of the district, see Wright *v.* Wills, has often arisen, and it was decided by M'Kean, chief justice, at *nisi prius,* that it was not applicable to lands out of that purchase.   That question has often arisen, and somehow or other has been always got over, generally because the line of the districts was uncertain and had never been ascertained.   In Harris *v.* Monks, 2 *Serg. & Rawle,* Judge Yeates treats it as undecided; and where the

[Marcy v. Gardinier.]

irregularity has arisen by mistake, I give no opinion about it; but here it was intentional on the part of the owner; and the deputy surveyor, in relating it, thought it necessary to say, by way of excuse, he made it as he was directed; it was done to grasp that for which otherwise there was no colour.

No warrant can be granted unless upon a certificate of two justices, on their own knowledge, or on the oath of a witness that the land is vacant, or if improved, how long improved. The meaning of this was and is, to prevent evidence of title being obtained from the land office for any land already appropriated; but this practice may evade the letter and spirit of this provision, and leaves open a door to obtain an appearance of title against all law.

If this is permitted, how far is it to go? There are many thousand surveys in the land office containing a quantity less than the amount called for. May a new survey be made and other land be returned on each of these? and if not on each of these, why on the land in question? Our land titles have occasioned many suits and much uncertainty; and I can see no good reason, or no reason at all, for introducing at this day a practice never thought of, or at least never heard of before, and this to assist an unhallowed attempt to rob a settler, of fifty years' constant residence, of half the land which by all former decisions was clearly his right.

I am of opinion the survey is totally void; but if Gardinier could hold one of the parcels, he made his election and built on and occupied for more than a year the part east of Marcy's fields, and an election once made is conclusive.

Judgment affirmed.